### McComb *v.* Barcelona Apartment Ass'n *et al.*

*(Supreme Court, General Term, First Department. April 18, 1890.)*

**1. Corporations—Execution of Mortgage—Assent of Stockholders.**
　　Under Laws N. Y. 1878, c. 163, providing that an association incorporated under Act Feb. 17, 1848, and its amendments, shall as a condition precedent to the giving of a mortgage to secure a debt contracted by it in the course of its business, have the assent of two-thirds of the owners of the capital stock, persons who have made no payments on their subscriptions, but are officers of the association, and persons who have made substantial payments either in cash or work, are stockholders for the purpose of giving their assent, though no certificates have been issued.

**2. Same—Assent not Necessary.**
　　It was part of the arrangement under which land was conveyed to an incorporated association that it should give two mortgages to secure future advances for improvements thereon, and the mortgages and the deed were executed and delivered contemporaneously. *Held,* that these mortgages were not within the act of 1878, and did not require the assent of stockholders.

**3. Same—Foreclosure—Judgment.**
　　In an action to foreclose the mortgages merely, it is error to include in the judgment a sum sufficient to satisfy advances in excess of the amount of the mortgages.

Appeal from judgment on report of referee.

Action by James B. McComb against the Barcelona Apartment Association and others. Judgment for plaintiff, and defendants appeal.

Argued before BRADY, BARTLETT, and DANIELS, JJ.

*William G. Choate* and *George H. Adams,* for appellants. *Thomas H. Hubbard,* for respondent.

DANIELS, J. The principal object of this action was the foreclosure of two mortgages bearing date on the 14th of January, 1884, and executed in the name of the Barcelona Apartment Association. This association was incorporated under the act of 1848, (February 17th,) authorizing the formation of corporations for manufacturing and other purposes, and the amendments afterwards made to that act. The certificate or articles of association was

made and filed in December, 1881. Its capital stock was the sum of $240,000, divided into 16 shares, of the par value of $15,000 each. The object of the incorporation was declared to be "the purchasing, leasing, acquiring, maintaining, and improving real estate for residences and apartment houses, to be leased and conducted by the corporation, and occupied by its stockholders and others." The property devoted to this object was situated between Fifty-Eighth and Fifty-Ninth streets, and Sixth and Seventh avenues, in the city of New York. Before the execution of these mortgages the land had been obtained for this object by Jose F. de Navarro, and the title to it taken in the name of his wife; and it was afterwards conveyed to James Clyne. The apartment house was in process of construction, and had progressed towards its completion, at the time when these mortgages were given. In its erection the business had been managed and conducted by Navarro for his own benefit, and that of the association. He had appropriated and expended large sums of money for this object prior to the month of June, 1883, and it had then become necessary, for the progress and completion of the building, to obtain the aid and assistance of some other person or persons. In May, 1883, he entered into negotiations with the plaintiff to provide such additional financial assistance as at that time had become necessary for the success of the enterprise. As a means of securing that end, a construction company had been organized, called the Central Park Building Company, Limited, with a nominal capital of $800,000. At the request of Navarro, and upon the representation that one-half the stock of the company would be taken by himself, and others acting with him, the plaintiff was induced to subscribe for $200,-000 of the stock under an agreement made by Navarro that he would return the money, with interest, and assume all liabilities for the balance remaining unpaid, 90 days after the completion of this and seven other buildings, if the plaintiff elected to transfer his interest in the company, and gave notice of such election within 60 days after the completion of the buildings; and, upon such transfer, Navarro further agreed that he would give a substantial guaranty for the faithful performance of the engagement.

After this agreement was made, the plaintiff subscribed for another portion of the stock, amounting to the sum of $100,000, and Theodore Adams, at his instance and for him, also subscribed for a like amount. The amounts subscribed in this manner, together with the first subscription made by the plaintiff, were paid by him. But, for the other half of the stock of the company, payments were not in fact made. The money in this manner paid by the plaintiff was principally used in defraying the expense of the construction of this and the seven other similar apartment buildings; but it proved insufficient to secure the completion of this or the other buildings. The plaintiff thereupon, taking the position that the financial condition of the enterprise had been misrepresented to him, declined to make further or additional advances than those which he had already made for this object; and on the 1st of December, 1883, an agreement was made and entered into between himself and Navarro for the arrangement of their disagreements, and for the advancement of other moneys by the plaintiff, to secure the success of this enterprise. This agreement provided for the return of the payments made for the stock of the Central Park Building Company within 4 months after the completion of the buildings, in case the plaintiff elected to surrender the stock, and receive the money he had paid, with interest; and, within 60 days after such completion, he gave notice of such election. It then proceeded to provide for the advancement of other moneys to pay for the progress of the work, and the completion of the buildings. These advancements were to be made, as it was first stated in the agreement, upon the basis that the entire eight buildings, with the cost of the land, should not exceed the sum of $4,500,000. But this was afterwards, and on the same day, by another agreement, increased to the sum of $5,000,000. It was then agreed that the parties would

encourage the mortgaging of the property of the company to the full amount of $2,800,000; and, to provide means in the mean time for the prosecution of the work on the buildings, the plaintiff agreed with Navarro to obtain and provide money upon the commercial paper of the company at lawful interest, and 5 per cent. commissions per annum, to the extent to which it should be necessary to pay the contractors for their work, according to the terms and provisions of their contracts, and to carry the buildings on to completion. It was further agreed that James Clyne, in whom the title to the land was vested, should make to the plaintiff a mortgage for the sum of $100,000, with interest at 6 per cent., due May 1, 1886, on the land occupied by the building of the Barcelona Association, to be used in obtaining an additional loan from the insurance company, which at that time already held a large mortgage upon the property; and, in case the mortgage should not be taken by such company or other parties on the terms mentioned, it should be held by the plaintiff, "as security for the advances to be made or procured by him, in the same manner as the other securities hereinafter specified." It was also agreed that Clyne should make a further mortgage on the same property, for $50,000, at the same rate of interest, payable to the plaintiff at the same time, "to be held by him as security for the repayment of such moneys as he may advance; such last-mentioned mortgages to be subject to previous mortgages for two millions eight hundred thousand dollars in the aggregate." The agreement then further covenanted that the apartment association itself should make such additional or collateral mortgages as might be necessary effectually to mortgage the buildings and improvements upon the land mortgaged by Clyne, and should authorize and assent to all the preceding mortgages, as that was required by its by-laws, and the statute under which it was organized, and the agreement stipulated for like mortgages upon each one of the other seven parcels of land.

Pursuant to this agreement and under the directions of Navarro, who acted throughout as well for the apartment association as for the Central Park Building Company and himself, Clyne executed and delivered these two mortgages, as well as similar mortgages upon the other seven parcels of land. They were acknowledged on the 29th of December, 1883, and payable at the times specified in the agreement, and were made to secure bonds executed for the like object. And it was further agreed, in the agreement already mentioned, that Clyne should execute and deliver to the plaintiff, for the company, a conveyance in fee of its property, subject to all the mortgages and a preceding lease, dated in March, 1883, given by Clyne to the apartment association for the period of 99 years. This agreement was afterwards changed in several respects by another, made on the 14th of January, 1884, between the Barcelona Apartment Association, by Navarro, its president, and Lespinasse, its secretary, and by the Central Park Building Company, by the same person as president, and James Clyne, and J. F. Navarro, and the plaintiff, individually. By this agreement it was further agreed that Clyne should convey the land directly to the association, and that the association itself, with the written assent of the owners of at least two-thirds of its capital stock, should execute and deliver two other mortgages upon the property, to secure other bonds in the like amounts as those already executed by Clyne, to take the place of the bonds and mortgages executed by him, and that those bonds and mortgages should be delivered to be held in escrow, and afterwards canceled when it should turn out that the other bonds and mortgages mentioned in this agreement of the 14th of January were held to be valid, effectual, and available, according to their intent. To carry this object into effect, Clyne and his wife executed a deed, dated on the 14th of January, 1884, to the apartment association, conveying the title to the land to the association, subject to his preceding mortgages, and consents were secured from individuals claiming to be the owners of 11 out of its 16 shares of capital stock to the execution and de-

livery of these two final mortgages. Their consent was verified by the affidavit of the secretary, and filed in the office of the clerk of the county; and the mortgages were executed and delivered as provided for in this agreement, and in the first agreement, made on the 1st of December, 1883.

These mortgages were dated on the 14th of January, 1884, and acknowledged the next day, which was the date of the acknowledgment of the deed from Clyne to the association; and in this manner the association itself became the owner of the property, and the lease previously received by it was probably thereby extinguished, for the legal rule is entirely well settled, where the owner of a lesser or inferior estate receives a conveyance of the legal title itself, that the lesser estate is merged and extinguished by the acceptance of such superior title. This rule is subject to the qualification, in equity, that the continued existence of the lesser estate will be maintained where that is the object and design, at the time, of its owner. But in this instance no evidence appears to have been given of any intention on the part of the apartment association to preserve and maintain the continued existence of this lease; and, in the absence of such an intention, the legal rule would apply, by which the lesser estate becomes extinguished. *Hill* v. *Pixley*, 63 Barb. 200; *James* v. *Morey*, 2 Cow. 246; *Lynch* v. *Pfeiffer*, 110 N. Y. 34, 17 N. E. Rep. 402. But, whether the lease was extinguished or not, the apartment association accordingly was, by this conveyance of the legal title, placed in the situation where it had the ability to mortgage the entire fee of the property, subject to the preceding incumbrances existing in favor of other parties upon it; and, to attain that end, these two mortgages in suit were executed and delivered.

But the right of the plaintiff to enforce the payment of these mortgages for the advancement of moneys afterwards made by him on their security has been contested on the part of the apartment association, and also by shareholders who had subscribed and paid for shares entitling them to apartments in this building. This has proceeded, in a large degree, upon the objection that chapter 163 of the Laws of 1878, providing for the manner in which the property of corporations created under the act of 1848 and its amendments should be permitted to mortgage its property, had not been complied with, for want of the assent of two-thirds of the owners of its capital stock. But this objection does not appear to be well founded, although, by a finding of fact made by the referee, he has found that Navarro, who subscribed the assent for two shares, Clyne for one share, and Lespinasse for another, had paid no part of their subscription for these four shares. No certificates for these or other shares were issued by the association; and the simple subscription of the articles probably would not, of itself, be sufficient to create these persons shareholders in this association. It is not essential that the certificates themselves should be issued for the subscriber to become a stockholder in the association; but something more than a mere subscription, as the fact has been found in this matter by the referee, is necessary for that purpose. But further findings of the referee have established the additional facts that Navarro was the president, Lespinasse the secretary, and Clyne a trustee, of the Barcelona Apartment Association. They consequently were, by the action of the association, accepted as shareholders in it, and were entitled to be considered as such for the purposes of this assent. In *Burr* v. *Wilcox*, 22 N. Y. 551, the controlling fact was different from this case; for there the price of the shares was fully paid. But in *Wheeler* v. *Millar*, 90 N. Y. 353, the subscriber was in fact accepted as a stockholder, and had been elected as a trustee and secretary of the corporation, and engaged actively in the management of its affairs, and appeared upon the books of the corporation as a stockholder. This case does not substantially differ in these material respects from the facts upon which this last decision was made, rendering the three parties voting for this assent the owners of the shares, within the rule maintained by this authority. The other persons assenting appear to have purchased their

shares still more effectually; for substantial payments were made upon the purchase price, which was deemed sufficient, in the first case just cited, to render the subscriber a stockholder. And whether this was done by the payment of the money directly, or by work performed by them for this or other associations, is not an important circumstance, as long as the fact is that an actual consideration was parted with by the other persons for the shares claimed, and acted upon by them in giving the assents. The assents obtained in this, manner represented 11 out of the 16 shares into which the stock or property of the association was divided. That was two-thirds of the shareholders, if not in number certainly in amount, and gave the legal sanction and authority of the association to the execution·and delivery of these mortgages.

But if the persons giving their assent, as these shareholders did, were not in fact the owners of the shares represénted by them and voted upon, still the mortgages appear to be legally supported; for it was a part of the arrangement or consideration upon which the association received the title to the land, under the deeds executed and delivered by Clyne and his wife, that these mortgages should in this manner be given. And the acts by which the agreement was carried into effect were contemporaneously performed; for, at the same time the deeds were executed and delivered, these mortgages were also executed and delivered to the plaintiff as a fulfillment of the consideration or agreement on which the deeds were made. The mortgages were not, therefore, to secure a debt contracted by the association in the course· of its business, which is the class of cases provided for by·the statute; but they were given, in effect, to secure the payment of a part of the purchase price of the property. And where the security is, in this manner, contemporaneously given, it has not been, either by express language or fair implication, included within the act of 1878; and such was intimated to be the construction which should be given to the act in *Sugar Co.* v. *Whitin,* 69 N. Y. 328, 336, 337. And this was, in substance, approved in *Coman* v. *Lakey,* 80 N. Y. 345. The referee was accordingly right in holding that the mortgages were not invalid because of any failure to comply with the requirements of this act.

Their enforcement has been further resisted under that part of the agreement of December, 1883, permitting the plaintiff to charge a commission upon the moneys to be advanced, amounting to 5 per cent. per annum. But it was not the intention, neither was it the language, of either of the agreements, that this charge could be made for moneys loaned by the plaintiff himself. What the commission was to pay for has been expressed in the agreement; and it was only to be charged·"in case it shall be necessary for said McComb to furnish credit as security in order to raise money on said paper." Then "a commission of 5 per cent., in addition to· interest, shall be allowed by said company therefor." This, as well as the preceding part of the agreement, indicates the understanding of the parties to have been that the commissions were to be paid only in case it became necessary for the plaintiff to furnish additional credit or security in order to raise the money on the paper of the association, or otherwise; and that, under the authorities, might well be stipulated for without rendering the indebtedness afterwards created under the agreement unlawful on account of usury. A similar point to this was examined and advanced in *Matthews* v. *Coe,* 70 N. Y. 239. And there being no reason to suppose, as there certainly is not, in this case, under the findings of the referee, that the commissions were designed as a mere cloak or cover for usury, the agreement for their contingent payment cannot be permitted·to have this effect. In *Van Tassell* v. *Wood,* 12 Hun, 388, it was supposed that an agreement of this nature would be usurious. But this view was not followed, but, on the contrary, disapproved, in 76 N. Y. 614, reversing the preceding decision. No more of the evidence has been brought before the court upon this appeal than such as is included in the findings of the referee; and neither that evidence, nor these findings, support the inference that these stipulations

were made to reserve to the plaintiff a greater amount than the lawful rate of interest.

Mortgages in all respects similar to these two mortgages were placed upon the other seven apartment lots and buildings; and the proof upon the trial is found by the referee to have established the fact that between the 1st of December, 1883, and the 29th of May, 1884, the plaintiff advanced the sum of $1,643,162.18, exclusive of any interest charged, and that the interest upon the moneys borrowed by him, and advanced, to promote the success of this enterprise, was the sum of $94,816.83. And, of the moneys procured and advanced by him in this manner, it has been further found that there was used and applied to the construction of the Barcelona Apartment building the sum of $207,399.24. These advances were made for more than the amount of the two mortgages executed by the association upon their security; and as the association had, before the commencement of the suit, failed to pay the debt as it was agreed to be paid, it was in default in the observance of the condition of the bonds and mortgages, and the plaintiff was authorized to institute the action which he did for the foreclosure of these mortgages, and the sale of the mortgaged premises; for no stipulation or condition in either agreement deprived him of the right to collect his advances made for this object in this manner. It was not necessary, neither does it appear that the referee has included within his decision any moneys or indebtedness as secured by the mortgages beyond that incurred by the advancement of these moneys from and after the 1st of December, 1883; and by the clear effect of the agreements, to which the mortgages were subordinated, and the assents given for their execution by the association, they were entitled to be held as security for these advancements. They were, in this respect, within the language of the assent of the shareholders sanctioning the execution and delivery of the mortgages. The money was supplied and used for the benefit of the association, certainly to the extent to which the mortgages were given for its security.

The referee has, however, in the judgment entered upon his decision, provided for the raising of so much money, beyond what will be necessary to satisfy these mortgages, as the plaintiff advanced for the use and benefit of the Barcelona Association. After receiving the title to the land from Clyne by the deed delivered to the association, and after these mortgages were in this manner executed and delivered by it to the plaintiff, the association declined to continue to hold the title which had been conveyed to it, and by resolution directed a reconveyance of the property to be made to Clyne; and such reconveyance was afterwards executed and delivered. But this action of the association could have no effect upon the execution and delivery of the mortgages, which had then become legal securities in the hands of the plaintiff; for he was permitted, without interference on the part of the association, to raise the money and make the advances which he did, up to the amount of the two mortgages, for the benefit of the association. It could not, as it did, through the action of the construction company and of Navarro, who acted throughout as the officer and agent of the association, receive these benefits in this manner, and afterwards deny the validity of the securities upon whose faith the advances were made. But, by the decision of the referee, he not only authorized and directed a judgment for the foreclosure and sale of the property included in the mortgage for the payment of the advances made by the plaintiff, together with the interest upon them, up to the full amount of the mortgages; but he directed the collection and payment to him, in like manner, of the additional sum required to satisfy the full amount advanced for the Barcelona Association. This was done under the effect given to a still further mortgage executed and delivered by the association to the Mercantile Trust Company, of the city of New York, to secure mortgage bonds of $1,000 each. These bonds, it was held, the plaintiff had become entitled to for the residue of his advance over and above those secured by his mort-

gages; and upon that fact, although the bonds had not been delivered to him, but had been mostly withheld from him, under the authority of the apartment association, the referee, by his decision, and the judgment entered upon it, directed this residue to be raised and paid to the plaintiff. And the cases of *Insurance Co.* v. *Van Rensselaer*, 4 Paige, 85; and *Trust Co.* v. *Seymour*, 9 Paige, 538, have been brought to the attention of the court as authorities sustaining this part of the judgment. But they fail to do so; for it was no part of the plaintiff's cause of action, as that was presented by his complaint, either to state or enforce this obligation. But the action was brought for the foreclosure of these mortgages, or, in case they should be held to be invalid, then for the foreclosure of the mortgages previously given by Clyne, and delivered in escrow for the plaintiff, to secure the same advances. That is, substantially, all that was within the issues presented by the pleadings in this action; and the referee was authorized to go no further than to decide and dispose of those issues.

Some other objections have been raised to maintain the appeal, but they are, in effect, disposed of by what has already been said, and need no further attention for the disposition of the case. So much of the judgment as included the excess of the advances made by the plaintiff for the Barcelona Association, over and above the amount, with interest, secured by his mortgages, was unauthorized, and should be reversed. But, with this modification, the judgment seems to have the support of the facts which have been found by the referee, and it should be affirmed, without costs of the appeal. All concur.